UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

LESTER MILLER, GARY BECHTEL, and
BRENDA SUTTON,

      Plaintiffs,

v.

THE BIBB COUNTY SCHOOL DISTRICT;
MACON-BIBB COUNTY BOARD OF
ELECTIONS AND VOTER
REGISTRATION; and ELAINE CARR, in
her official capacity as Executive Director of
the Bibb County Board of Elections and Voter
Registration,

      Defendants.

CIVIL ACTION FILE
NO.:   5:12-CV-00239-HL

**PLAINTIFFS' BRIEF IN OPOSITION TO BIBB COUNTY SCHOOL
DISTRICT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT**

**I. BACKGROUND**

The School District's motion is misplaced both legally and factually.

Unfortunately, the District's action will simply expand the litigation at the expense

of the taxpayers, who pay both Defendants' attorneys' fees and those of Plaintiffs

as the prevailing parties.  *See* 42 U.S.C. §§ 1973*l*(e) & 1988.  In that regard, the

District's motion is consistent with its inclinations throughout the case.

It was apparent when this action was filed that the district lines used for

qualifying candidates for the primary election of July 31, 2012, were unconstitutionally malapportioned. But for this action being filed and an injunction issuing from this Court, those unconstitutional districts would have been used by the Defendants for that primary election. Upon filing the Complaint, Plaintiffs' counsel immediately contacted counsel for the Defendants, County Attorney Mr. Adams who represents the Board of Elections and Defendant Elaine Carr (the "County Defendants") and Mr. Millsaps who represents the School District. Mr. Walbert for the Plaintiffs and Mr. Adams for the County Defendants worked cooperatively and quickly to expeditiously resolve Plaintiffs' claims. Their discussions resulted in what was ultimately set forth in the order presented to the Court and entered on June 29, 2012. Mr. Millsaps was a party to those discussions, but the School District was a reluctant participant throughout. Initially, the School District indicated that it would not agree to anything, and that it would only do what this Court ordered after a hearing. At one point, it indicated that it desired, instead, to file a motion to dismiss, rather than resolve the case with a minimum of litigation.

After the entry of this Court's injunction orders, which fully resolved the merits of the case, Plaintiffs' counsel again discussed with counsel for Defendants the only remaining issue – Plaintiffs' right to attorneys' fees. There were two

issues in that regard.  First was the amount of the fees to be awarded.  Second was the portion of the fees that each Defendant would pay.  Plaintiffs made it clear that they had no desire to file a motion to require this Court to resolve the question of fees.  Contested fee litigation would only expand the cost of the case unnecessarily.[1]  Once again, the County Defendants and their counsel agreed to try to resolve Plaintiffs' fee claim by agreement.  That effort was brought to a halt, however, by the School District's refusal to have *any* discussion whatsoever about fee liability.  As a result, Plaintiffs are now compelled to file a fee motion.

Since all of the substantive relief necessary in this case had already been entered by this Court **before** the School District's motion was even filed, one can only guess that the purpose of its motion is a misguided effort to "collaterally" expand the litigation over fees, as that is the only remaining issue.  The only effect of the District's motion, however, is to increase the time and effort expended in the litigation and thereby increase the ultimate fee award.

## II. THE ARGUMENTS ASSERTED IN THE SCHOOL DISTRICT'S MOTION ARE WITHOUT MERIT.

It is not the desire of Plaintiffs' counsel to write an extensive brief

---

1  Plaintiffs' attorneys' time spent seeking fees is also taxed to Defendants.  *See, e.g., Norelus v. Denny's Inc*., 628 F.3d 1270, 1301 (11th Cir. 2010); *Jackson v. State Board*, 332 F.3d 790, 798-99 (11th Cir. 2003); *Jonas v. Stack*, 758 F.2d 567, 568-69 (11th Cir. 1985).

addressing all of the many reasons why the School Districts' motion is misplaced. Rather, Plaintiffs will attempt to do so more succinctly in an effort to minimize the time and fees expended on this distraction. Plaintiffs will begin by noting some of the gaping holes in the District's unprecedented motion. Prior to filing its motion, the School District had been the subject of two injunctive orders in this case. The School District represented to this Court in connection with the first order of June 29, 2012 that it had <u>no</u> <u>opposition</u> to the entry of that injunction, which applied to all Defendants. [Doc. 9, p. 9]. The second order issued by the Court on July 16, 2012, was a consent order. All parties, including the School District, agreed to the entry of that injunction. [Doc. 12].

Conspicuous by its absence in Movant's brief is any mention of this history. Equally conspicuous is the absence of any authority that would allow a party to be dismissed from a case *after it has consented* to the entry of injunctive relief against it and there is no question that the court has subject matter jurisdiction. If the District's motion had any validity – which it does not – would it mean that the earlier consent orders would be "unwound" in some way? Would they be rewritten, retroactively, to implicitly excise the School District? Plaintiffs do not wish to represent to this Court that they have done an exhaustive search to establish that a party that has consented to equitable relief cannot subsequently

move for its complete dismissal from the action, since Plaintiffs hope to minimize the time litigating these issues. But common sense surely suggests that no such authority exists.

Turning to the specific "Arguments and Citation of Authority" in the School District's brief, Plaintiffs would next note that the District's initial argument has nothing to do with this case. The argument cites cases to the effect that there is "no respondeat superior or vicarious liability under section 1983." School District Brief at 3. That proposition, however, simply relates to the fact that <u>damages</u> that lie against an individual governmental defendant in his/her individual capacity are not collectible directly against the employing governmental entity based on respondeat superior alone. While that is black letter law, it has nothing to do with this case. Plaintiffs seek no award of damages for the denial of their constitutional rights, which in fact were not ultimately denied because of this Court's injunctive relief.

The School District's next argument is apparently that the proper defendant in this action would have been the Georgia General Assembly because it "is the only legislative body with power to enact redistricting legislation." School District Brief at 4. The School District, so the argument goes, should not have been included in this action. This argument, however, ignores law that goes back

consistently to the early days of the United States Constitution. One of the landmark cases we were all taught in law school is *Ex Parte Young*, 209 U.S. 123, 28 S.Ct. 441 (1908). In that seminal case, the Supreme Court held that a governmental officer, acting pursuant to a statute duly enacted by a state legislature, is subject to injunctive suit in federal court and the constitutionality of that law can be determined by the federal court. Thousands of cases since 1908 have followed and applied that holding to government officers and entities. The School District's inference that it is immune from suit because it cannot self-reapportion is frivolous.

The School District also implies that, alternatively, the County Defendants might be proper defendants in this action. Whether the County Defendants were necessary parties to this action, however, has nothing at all to do with the propriety of the School District being a defendant. No authority the School District cites would indicate the contrary. Under *Ex Parte Young* and its bountiful progeny, state or local government officials and entities acting pursuant to a state law are proper defendants in equity cases. There is no rule of law that there is only one "most proper" such defendant.

There can be no doubt that the persons with the greatest interest in the instant litigation are the members of the School Board and the School District

itself.  Had the School District not been included as a defendant, a motion contending that a necessary (and possibly indispensible) party had been omitted would have been much better taken than the instant motion by the School District. Not only does the School District, by definition, have the greatest interest in determining how its districts are in fact configured for election, and not only is the School District, by definition, most interested in who runs for and wins those elections, an election supervisor really has no "dog in that fight."  Had the issues in this case been closer, for example, would the County Defendants have had any interest – or legal responsibility – to mount a defense to the alleged unconstitutionality of the districts at issue?  In an analogous case, if vote dilution claims were brought challenging the constitutionality of the Bibb County school districts but only Elaine Carr was named as a Defendant, what possible interest would she or her office have had in devoting the resources necessary to defend such claims?  It is obvious that the School District would be the appropriate party in such litigation, and the exact same thing is true in this case.

The history of voting litigation in Georgia resoundingly confirms that the one defendant that is always present in such cases is the elected entity itself, or its officers in their official capacities.  In the first vote dilution case brought in this district, for example, the elected officials of the City of Albany were the named

defendants. *Paige v. Gray*, 538 F.2d 1108 (5th Cir. 1976). Although the districting

scheme held unconstitutional in that case was a 1947 Act of the legislature, the

General Assembly was not a party. Neither was the Dougherty County Board of

Elections that conducted city and county elections there. One of the next cases was

*Thomasville Branch of NAACP v. Thomas County,* 688 F.2d 280 (5th Cir. 1982),

639 F.2d 1384 (5th Cir. 1981), 571 F.2d 257 (5th Cir. 1978), and the circumstances

there were the same. The districts at issue had been established by the General

Assembly, and the independent, statutorily created Board of Elections was not a

defendant. The list of similar cases is lengthy. *See, e.g., Rogers v. Lodge,* 453

U.S. 613 (1982); *McIntosh County NAACP v. City of Darien*, 605 F.2d 753 (5th

Cir. 1979).

Were all of this not plainly fatal to the School District's motion, the

particulars of the instant litigation make the position of Movant even more

untenable. The problem in this case was not a result of the General Assembly's

failure to enact a constitutional plan after the 2010 census. The problem arose

from the failure to timely obtain and implement Section 5 preclearance of the new

law under the Voting Rights Act. *See* 42 U.S.C. § 1973c. While the School

District argues that it had no responsibility for that failure, the opposite is true,

both legally and factually.

Under Section 5 and its implementing regulations, there is no question that the Bibb County School District is subject to the procedural mandates of that law. As 28 C.F.R. § 51.6 states, "All political subunits within a covered jurisdiction (*e.g.*, counties, cities, school districts) that have not terminated coverage by obtaining the declaratory judgment described in section 4(a) of the Act are subject to the requirements of section 5."[2]  The regulations define "covered jurisdiction" to be a "political subdivision," like the School District here.  28 C.F.R. § 51.2.  The statute and the regulations explicitly put the responsibility on that "jurisdiction" to ensure compliance with the requirements of Section 5.

> Section 5 requires that, prior to enforcement of any change affecting voting, the **jurisdiction** that has enacted or seeks to administer the change must either:
>
> > (a) obtain a judicial determination from the U.S. District Court for the District of Columbia . . . [or] (b) make to the Attorney General a proper submission of the change to which no objection is interposed.
>
> It is unlawful to enforce a change affecting voting without obtaining preclearance under Section 5.  The obligation to obtain such preclearance is not relieved by unlawful enforcement.

28 C.F.R. § 51.10 (emphases added).[3]  In sum, it was the legal responsibility of the

_____

2  There has, of course, been no "termination" declaration for the Bibb County School District.

3  The authority to make submissions on behalf of "jurisdictions" like the Defendant School District is vested in the "chief legal officer or other appropriate

Defendant School District under the Voting Rights Act to ensure compliance with Section 5. That did not happen, and it was the School District's failure in its *legal responsibility* under Section 5 that gave rise to this action.

The same conclusion follows from state law. As the School District acknowledges, H.B. 963 expressly made the District responsible for obtaining Section 5 approval. Necessarily, that responsibility required Section 5 preclearance *so that the substantive terms of H.B. 963 would be carried out*. That meant, of course, acting with sufficient dispatch, and competence, to obtain preclearance in time for the 2012 primary election.

The School District's "defense" to these clear federal and state mandates is nothing short of astonishing. The District cites to the 30 day *maximum* time limit required under H.B. 963 to make a submission. From there, the District argues that it technically made a submission within 30 days of the Governor's signature, so it should have no responsibility for the lateness of Section 5 preclearance. Under this argument, had there been no time limit stipulated in the statute, the School District would be arguing that it could have submitted the statute at any time, maybe "timely" enough to permit constitutional elections in 2014 or 2016! Citing to the "outer limit" in the state statute is certainly irrelevant to the School District's

official of the submitting authority or by any other authorized person on behalf of the submitting authority." 28 C.F.R. § 51.23(a).

responsibility under federal law to obtain timely preclearance.[4]  It is also irrelevant

to its state law duty to act with sufficient dispatch to ensure that H.B. 963 was

implemented according to its purpose and terms – *i.e.,* for the 2012 elections.

As a matter of the actual facts that transpired in this instance, the School

District was unquestionably ***the*** party responsible for the malfeasance that gave

rise to Plaintiffs' claims.  As noted in Plaintiffs' Response to the District's

Statement of Material Facts not in Dispute, there has not yet been any discovery in

this case, so the details of the School District's malfeasance and nonfeasance

cannot be set out before the Court in undisputed detail.  But it is clear now that the

District is, far and away, *the* culprit in this case.  The School District admits that it

sought preclearance of H.B. 963.  However, as stated in Plaintiffs' *verified*

Complaint, the wrong districting map was submitted to the Department of Justice

("DOJ").  "Instead the [School] District sent the DOJ one of its proposals [that] the

District [had] sent to the Bibb County delegation during the 2012 session."  It was

not until April 30, 2012, that this error was corrected by the District and the actual

H.B. 963 plan was submitted to the DOJ.  (Complaint, Doc. 1, ¶¶ 23-24).

---

4  Movant also ignores the fact that, on request to the DOJ, submissions can be
expedited where an election is imminent, and the School District could have made
its initial submission when the final bill passed both the House and Senate on
March 29, 2012.  Particularly where there is an upcoming election, the DOJ will
begin processing such a submission, though preclearance may await final signature
by the Governor.

To further document the factual nexus between the School District and the underlying malfeasance in this case, Plaintiffs' counsel submitted an Open Records Act ("ORA") request to the School District upon receiving the instant motion requesting inspection of all documents regarding "efforts by the School District . . . to prepare a Section 5 submission for the DOJ; all records relevant to the actual submission and communications with the DOJ; [and] correspondence . . . pertaining to the submission and communications with the DOJ." *See* Exhibit 1 attached here, letter of August 24, 2012. In response, the District's litigation counsel replied that an initial review of the relevant records indicated that the fee to simply assemble the documents for inspection would be $1,066, and assembling those documents would require 16 hours of employee time. *See* Exhibit 2 attached hereto. Even assuming that the School District's response was inflated in order to impede ORA production,[5] the District necessarily acknowledges the presence many documents in its possession that tie it to the mishandled preclearance.

What is most troubling about the School District's representations to this Court, however, is its effort to falsely portray its role in the final decision as to

---

5   To minimize the time required to resolve the issues before this Court, counsel has not paid the School District the requested $1,066, which would just be another expense that increased the fee award. If the School District was somehow successful in forcing Plaintiffs to actually go through that discovery to reach the summary judgment issues, the documents would be sought without charge through either a request to produce or a deposition and subpoena.

what redistricting plan would be used for candidate qualifying and the elections. The School District again disavows responsibility for that decision, but the truth is the opposite. In fact, the County Defendants inquired of the School District before qualifying began which of the district maps should be used – the old one or the constitutionally proper one which had been delayed in the Section 5 approval process by the District's malfeasance. In response to that inquiry ***the School District counsel himself, Mr. Millsaps, instructed Defendant Elaine Carr to use the old, unconstitutional plan.*** The affidavit from Ms. Carr setting forth those events accompanies this brief as Exhibit 3. As Ms. Carr's affidavit states, Board of Elections Chairperson, Stephen Allen, wrote the School Superintendant on April 25, 2012, requesting direction on which lines to use for candidate qualifying on May 23, 2012. On May 14, 2012, Ms. Carr sent a follow up email to School District executives and their counsel, again requesting their decision as to which districts to use for qualifying. On the next day, May 15, 2012, Ms. Carr received a telephone call at 9:11 a.m. from Mr. Millsaps. He instructed her to use the old, unconstitutional districts, and it was *because of his instructions* that qualifying was conducted under the old lines. Exhibit 3, ¶¶ 5-6.

Mr. Millsaps subsequently sought to deny that he had given those instructions to the Board of Elections. That came about when a reporter from the

Macon Telegraph asked Ms. Carr how the problem that gave rise to this lawsuit had occurred. As part of that discussion, Ms. Carr told the reporter about her May 15th discussion with Mr. Millsaps when he had instructed her to use the old lines. The reporter called Mr. Millsaps, who tried to create his own revisionist history and deny culpability. Mr. Millsaps emailed Ms. Carr about the reporter's call, and stated in his email that he had told the reporter that "the reporter was mistaken [and] was misquoting you." *See* Attachment D to Exhibit 3. Ms. Carr replied to Mr. Millsaps the same day, correcting him and advising him that she had contemporaneously written down notes of the substance of Mr. Millsaps' May 15th instructions to her. *Id.* As Ms. Carr wrote on May 15, Mr. Millsaps told her that "we have to go by [the] old school lines." *See* Attachment C to Exhibit 3.

Finally, Plaintiffs note that the School District's "Argument B" has nothing to do with the District's motion. The cases cited there relate in the most general way to (1) the standards for determining constitutionality in one-person/one-vote cases and (2) the equitable considerations for relief in such cases. If either of those points were ever relevant in this case, that was only before this Court's unopposed injunction issued. They have no bearing on the present motion.

## III. CONCLUSION

For the foregoing reasons and based on the entire record in this action, the

School District's Motion to Dismiss, or in the Alternative, Motion for Summary

Judgment, should be denied.

Respectfully submitted:


/s/   David F. Walbert
David F. Walbert
Georgia Bar No. 730450
dwalbert@pcwlawfirm.com
A. Lee Parks
Georgia Bar No. 563750
lparks@pcwlawfirm.com

PARKS, CHESIN & WALBERT, P.C.
75 Fourteenth Street, 26th Floor
Atlanta, GA  30309
(404) 873-8000 Telephone
(404) 873-8050 Facsimile

/s/  Charles E. Cox, Jr.
Charles E. Cox, Jr.
Georgia Bar No. 192305
charles@cecoxjr.com

CHARLES E. COX, JR.
3464 Vineville Avenue
Macon, GA  31204
(478) 757-2990 Telephone
(478) 757-2991 Facsimile
*Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that I served the within and foregoing PLAINTIFFS' BRIEF IN OPOSITION TO BIBB COUNTY SCHOOL DISTRICT'S MOTION TO DISMISS OR FOR SUMMARY JUDGMENT on all counsel by filing with the Court's electronic filing and service system (CM/ECF), which will automatically send e-mail notices of such filing to all attorneys of record.

This 10th day of September, 2012.

          /s/   David F. Walbert
         David F. Walbert
         Georgia Bar No. 730450
         dwalbert@pcwlawfirm.com
         A. Lee Parks
         Georgia Bar No. 563750
         lparks@pcwlawfirm.com

**PARKS, CHESIN & WALBERT, P.C.**
75 Fourteenth Street, 26th Floor
Atlanta, GA  30309
(404) 873-8000 Telephone
(404) 873-8050 Facsimile